UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE ) <br> COMPANY, f/k/a/ JOHN HANCOCK ) <br> MUTUAL LIFE INSURANCE COMPANY, ) <br>       Plaintiff, ) <br> ) <br>   vs. ) <br> ) <br> JUDITH A. ROBINSON, ) <br>       Defendant. ) | 1:04-cv-1887-SEB-VSS |

### ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This is a declaratory judgment action and our jurisdiction is based upon diversity of citizenship. Plaintiff John Hancock Life Insurance Company ("John Hancock"), a Massachusetts insurance company, asks this court to find that it owes no coverage benefits under two disability insurance policies it issued to Dr. Judith A. Robinson, the Defendant. Dr. Robinson, an Indiana resident and physician, has counterclaimed seeking a determination that she is entitled to benefits under both policies because she has suffered a progressive injury to both her rotator cuffs which has left her unable to perform the material responsibilities of her regular occupation as a board certified OB/GYN practitioner. Though the bulk of the relevant and material facts are undisputed here, some discrepancies remain; we, therefore, deny the summary judgment motions filed by both Dr. Robinson and John Hancock.

*Factual Background*

Dr. Robinson began practicing medicine in Indianapolis in 1987, following completion of her residency in obstetrics and gynecology ("OB/GYN") at Methodist Hospital.  She is board certified in OB/GYN and, in 1999, after practicing as a sole proprietor, founded Eagle Creek OB/GYN, Inc.  She initially employed two nurse practitioners, two medical assistants and a registered nurse.  Later, other physicians either worked for or bought into the corporate private practice.

Shortly after beginning her medical practice, Dr. Robinson sought protection against the loss of her ability to practice as an OB/GYN specialist through the purchase of disability insurance.  In 1987 and again in 1988, Dr. Robinson applied for and was issued two separate individual disability insurance policies.  The Policies provide for the payment of monthly disability benefits in the event of her total disability.  Pursuant to the policy provisions, "total disability" means an incapacity which has the following four characteristics:

    (1)   it begins while the policy is in force;
    (2)   it is due to injury or sickness;
    (3)   it requires the regular care of a physician; and
    (4)   it prevents the insured from performing the material duties of her regular occupation.

Dr. Robinson's practice has included care and treatment of both obstetrical and gynecological patients, including examination and treatment at her offices and surgical procedures in other facilities, such as hospitals.  Since 1989, Dr. Robinson has also performed "staff call" duties for Methodist /Clarian Hospital.  As a part of those responsibilities, she supervises, directs and assists medical residents in the care and treatment of hospital OB/GYN

patients, including those who present at the hospital's emergency room during the hours she is on call as staff OB/GYN.

In 2000, Dr. Robinson began having difficulties with her right shoulder. At that time, in terms of by categorizing her patient contacts as either OB or GYN related, approximately 85% of her practice was obstetrical and 15% was gynecological. In comparison, in measuring her practice by "unit charges," earnings or practice time, the analysis reflects that she devoted more time to gynecological patients than to the obstetrics patients. Based on these statistics, we are confident in concluding that, in 2000, Dr. Robinson's practice in each of her two substantive specialties imposed approximately equal demands. In ensuing years, because of the physical demands of an obstetrics practice, coupled with Dr. Robinson's ongoing physical problems which affected both shoulders, she reduced and eventually dropped all of her private practice in obstetrics. Eventually, her shoulder problems foreclosed performance of a majority of surgical procedures as well as many examination procedures required in her gynecological practice. Despite these limitations, she maintained some private practice and continued to serve on staff at the hospital. Most recently, according to the testimony of the Methodist-Clarian Director of Obstetrics Services, Robinson serves as an employee of the hospital as an OB/GYN generalist on a half time basis (in contrast to her prior status as an outside educational contractor).

Dr. Robinson first sought treatment for her shoulder problems from Dr. Gary Misamore in July of 2000, based on what she described as very significant right shoulder pain which had increased over the previous six months. After an MRI, Dr. Misamore determined that she had degenerative right rotator cuff disease that had caused a severe partial tear.

Over time, the pain increased and emanated from both shoulders. Because of problems she experienced in adjusting the position of prenatal babies as well as problems associated with childbirth deliveries, Dr. Robinson performed fewer and fewer obstetric procedures. She returned to Dr. Misamore in the summer of 2003 complaining of significant weakness and pain in both shoulders. An MRI of both shoulders revealed ruptures of both supraspinatus. Dr. Misamore's diagnosis was chronic massive rotator cuff tears on both sides of Dr. Robinson's body, for which surgical help was largely unavailable. He opined that her prognosis was very poor and that she faced permanent limitations of her ability to continue her work as an OB/GYN. Dr. Robinson was told by Dr. Misamore that "any activity requiring lifting or reaching with your arms away from your body, aggressive pushing or pulling, or quick forceful movements will likely cause marked increase of symptoms." In view of this diagnosis and prognosis, Dr. Robinson informed the other doctors in her practice group that she was unable to continue as the primary physician in obstetrics cases, but that she would continue with staff coverage and residency supervision and would attempt to continue her gynecological practice. She then filed a claim with John Hancock seeking benefits for total disability, effective July 29, 2003.

Since the filing of that claim, Dr. Robinson has also had to decrease the scope of her gynecological practice to fewer than 30% of the procedures she previously performed. She continues to schedule gynecological surgeries for Fridays but performs a supervisory role over residents and her scrub nurse who perform the greater number of hands-on responsibilities. Dr. Robinson continues to perform her duties as a hospital staff doctor at a half-time level and, because of increases in the amount of the hourly fees paid to staff physicians, her income has increased.

Following an examination of Dr. Robinson in 2005, Dr. Misamore noted a dramatic weakness in both of her shoulders, assigning a permanent partial impairment of 15% to each of Dr. Robinson's upper extremities, equaling a 17% impairment to the body as a whole. Dr. Mismore further opined that, based upon the list of gynecological procedures Dr. Robinson would typically be required to perform, she would have difficulty performing all of them safely and effectively.

Dr. Robinson has submitted the affidavit of Dr. Donald Cline, a board certified OB/GYN physician, who has reviewed her medical records and the records applicable to her practice history, based upon which he concluded that Dr. Robinson is incapable of performing most OB/GYN procedures independently because she lacks the requisite strength in her shoulders and arms. Further, he believes it is unfair and, indeed, unsafe for her to act as the supervising physician in charge of residents who are performing or assisting with various OB/GYN surgeries and procedures because, as the supervising physician, she must be able to step in at any time and complete a procedure on her own.

Dr. Robinson continues even now to supervise residents who must be relatively self-reliant, receiving from her only such hands-on assistance as she is physically able to give. Dr. Robinson has testified that she believes that residents under her supervision receive competent and qualified instruction and oversight. Because residents do not charge for their services, the charges for surgery performed on patients of Eagle Creek OB/GYN, Inc. are assessed by that medical corporation and the procedures accomplished while Dr. Robinson is supervising on staff call are performed under the aegis of the related hospital health network. In either event, Dr. Robinson receives remuneration from the work.

In order to maintain her hospital credentials, Dr. Robinson, like other physicians, is subject to peer review of her work and the general quality control assessments by the Director and Chair of her department, Dr. Marshall Keltner.  Dr. Keltner testified that, despite his review of the affidavit of Dr. Cline, he has no significant concerns with respect to Dr. Robinson's ability to continue as a staff OB/GYN physician.  Dr. Robinson has informed him that she is able to perform all the duties applicable to her as a member of the staff, including the occasional hands-on delivery or a more problematic situation requiring her to step in and complete a procedure.  No complaints have been received regarding Dr. Robinson's performance, and no specific performance or standard of care inquiry has been conducted.  According to Dr. Keltner, although Dr. Robinson has limited her private practice to certain gynecological work, she is expected to perform her responsibilities as an OB/GYN generalist for the hospital health network without such limitation.

### *Summary Judgment Standard*

In addressing cross motions for summary judgment, we may grant summary judgment (in whole or in part) or deny (in whole or in part) either or both parties' motions.  While cross motions for summary judgment in declaratory judgment actions may frequently lead to a judgment without trial, the standard for determining whether a summary judgment should issue is unchanged from that which applies when only a single party has moved for the relief.  Summary judgment is available if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  To determine whether any genuine factual issue exists, the Court examines the pleadings and the proof as presented in depositions, answers to interrogatories, admissions, and affidavits made a part of the record.  *First Bank &*

*Trust v. Firstar Information Services, Corp.*, 276 F.3d 317 (7th Cir.2001). The Court draws all reasonable inferences from undisputed facts in favor of the non-moving party and views the disputed evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). However, the non-moving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, he must go beyond the pleadings to support his contentions with properly admissible evidence. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).

*Discussion*

Both parties have focused their substantive briefing on the Seventh Circuit opinion in *McFarland v. GeneralAmerican Life Ins. Co.*, 149 F.3d 583 (7th Cir. 1998).[1] *McFarland* contains helpful guidance for how a court should go about examining the issue of total disability under a disability policy which requires the insured to be incapable of performing the material and substantial duties of his or her occupation. That case was based on diversity jurisdiction applying Illinois law. Here, we must apply the law of Indiana, and while Indiana law may be similar to that in Illinois allowing the discussions in *McFarland* to provide some guidance to this court, we rely primarily on opinions of Indiana courts on the subject of determining disability

---

[1] The parties have also devoted a portion of their discussion to an unpublished decision issued by a judge of this court, *Hamaker v. Paul Revere Life Ins. Co.*, 2004 WL 963701 (S.D. Ind. April 2, 2004). However, that case dealt with a policy which provided benefits for both total and partial disability, and the legal issues pertained to which, if either, of the two coverages applied under the circumstances, which makes the case distinguishable from the case at bar. Further, this decision was not released for publication and, even if it had been published, federal district court decisions are not binding on other districts or even judges within the same district. *TMF Tool Co., Inc. v. Muller,* 913 F.2d 1185, 1191 (7th Cir. 1990); *U.S. v. Articles of Drug Consisting of 203 Paper Bags,* 818 F.2d 569, 572 (7th Cir. 1987).

under occupational disability policies issued in this state.  To that end, *Continental Casualty Co. v. Novy*, 437 N.E.2d 1338 (Ind. App. 1982) in our judgment provides the most direct guidance.

In *Novy*, a rural, general medical practitioner developed radiodermatitis, an injury to his hands resulting from over exposure to x-rays.  *Id.* at 1340-41.  Dr. Novy possessed an occupational disability policy issued by Continental Casualty which had been offered to him as a member of the Indiana State Medical Association.  *Id.* at 1340.  The insurer offered an expansion of benefits, from $800 per month to $1200 per month, subsequent to Dr. Novy's diagnosis of radiodermatitis.  *Id.* at 1341.  After he informed the insurer of his skin condition, an increase in coverage for disability resulting from conditions other than a "skin disorder" was effected through the issuance of two new policies, one for general disability and one for occupational disability.  *Id.*  Despite his worsening condition, he continued to practice medicine developing ulceration of his hands which required grafts and eventually the amputation of two fingers. *Id.* He temporarily received the $800 per month in disability benefits while recovering from the grafts and the same benefits again following the amputation of his fingers.  However, when, in order to wind down his practice and refer regular patients to other doctors, he reopened his practice after the amputations, his benefits were terminated.  *Id.*

Dr. Novy filed suit against Continental Casualty a few months later, seeking payment of benefits under his disability policy.  *Id.* at 1342.  While that suit was pending, he accepted a position as staff physician at a VA hospital.  That position did not authorize him to conduct any surgeries, limiting him to examination, diagnosis and non-surgical treatment of patients.  *Id.* at 1341-42. Following a bench trial, the trial court found that Dr. Novy was disabled and entitled to $1200 per month in disability benefits.  *Id.* at 1342.  The basis of the trial court's decision was

that Dr. Novy was first entitled to the policy maximum benefit of 60-months for his occupational disability, beginning at about the time his two fingers were amputated because, at that point, he lacked the ability to exercise the degree and skill ordinarily possessed by a general practitioner in his general locality. *Id.* at 1346. Those benefits were exhausted; nonetheless, the trial court ruled that Dr. Novy was disabled from his work in general and therefore entitled to the general disability benefits following the exhaustion of occupational disability. *Id.*

Among other issues addressed on appeal[2] in the Novy case was Continental Casualty's challenge to the determination that Dr. Novy was occupationally disabled, given that Dr. Novy had pursued and obtained employment at the VA hospital which position allowed him to continue to apply his medical skills and knowledge. *Id.* at 1350. Relying on the established principle in construing an insurance policy that the intent of the parties to the contract controls and should be given effect by the court's rulings, the court opined that Dr. Novy reasonably would have assumed that he was insured against the loss of his form of practice as a general practitioner in Garrett, Indiana. *Id*. at 1347. The Court concluded:

> "Occupation" is the occupation of the individual policyholder. It is the ability to continue in his particular occupation for which he seeks protection by insurance. Thus the trial court reasonably concluded that Novy sought occupational disability insurance in order to protect himself against the loss of his general practice due to disability. The trial court's finding that Novy was occupationally disabled was supported by the evidence and was proper under the law.

*Id.* at 1351.

Applying these principles to the case at bar, it is clear that many of the facts which are

---

[2] Ultimately the appellate court found that Dr. Novy was occupationally totally disabled, but not generally totally disabled and that the benefits were limited by the elimination rider to $800 per month. *Continental Casualty Co. v. Novy*, 437 N.E.2d 1338 (Ind. App. 1982).

relevant to a determination of whether Dr. Robinson is occupationally disabled are uncontested: the scope of her current duties, the effect of her shoulder injuries, the amount of money she is earning in her practice.  However, other important facts remain unsettled and in dispute, i.e., whether Dr. Robinson retains and exercises the degree of care and skill ordinarily possessed by a practicing OB/GYN in the Indianapolis, Indiana, area.  Dr. Keltner and Dr. Cline differ in their views on this key issue; indeed, the credibility of Dr. Robinson has been put at issue by her alleged statement to Dr. Keltner that she can safely continue to function in her capacity as a staff OB/GYN generalist, despite her inability to perform the material responsibilities of her occupation.  While this apparent inconsistency may be more a "quantitative" issue, rather than a "qualitative" issue, *See McFarland*, 149 F.3d at 587-88, we can not resolve the matter on summary judgment.  Neither can we assess its relative importance on the record before us.

     Our determination of Dr. Robinson's ability to continue to practice as a physician specializing in OB/GYN is not necessarily dependent on the determination of the hospital, but evidence must be adduced to permit the Court to determine the nature and extent of Dr. Robinson's duties.  We understand the holding in Novy, in part, to be that, under Indiana law, a doctor with a particular type of practice may be occupationally disabled even if that doctor continues to apply in any position but on a more limited basis some of the same skills utilized in connection with the doctor's original, unaffected practice.  From the record before us, we cannot make the required decision without assessing the credibility of witnesses, which clearly should not occur without in-person testimony.   Even if we were to decide that Dr. Robinson can no longer practice in a way for which she sought to insure herself against disability, when she became disabled is also a fact in conflict.  Accordingly, summary judgment is not available.

In addition to the summary judgment motions filed by both parties, John Hancock has moved to strike Dr. Robinson's reply brief due to its length and "new issue" content. In response, Dr. Robinson sought post-filing permission to file a brief in excess of local rule page limitations. We have reviewed the briefs and determined that John Hancock is not prejudiced by the content or added length of the reply brief filed by Dr. Robinson. Therefore, post-filing leave to exceed the page limitation for reply briefs is now granted Dr.Robinson.

### *Conclusion*

Defendant's Motion for Leave to File Reply Brief in Excess of Twenty Pages (filed twice as Document #62 & #64) is GRANTED. Plaintiff's Motion to Strike Defendant's Reply Brief and Affidavit (Document #60) is DENIED. Plaintiff's Motion for Summary Judgment (Document #38) is DENIED. Defendant's Motion for Summary Judgment (Document # 34) is DENIED as well.

IT IS SO ORDERED.

Date: 10/19/2006

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Robert L. Clark
HOEPPNER WAGNER & EVANS LLP
rclark@hwelaw.com

Robert E. Saint
EMSWILLER WILLIAMS NOLAND & CLARKE

rsaint@ewnc-law.com

Mark E. Schmidtke
SCHMIDTKE HOEPPNER CONSULTANTS LLP
mschmidtke@hwelaw.com